Wilbur Howard McCormack v. Commissioner. Howard McCormack, Transferee v. Commissioner.
McCormack v. Commissioner
Docket Nos. 46209, 51928.
United States Tax Court
T.C. Memo 1956-216; 1956 Tax Ct. Memo LEXIS 78; 15 T.C.M. (CCH) 1133; T.C.M. (RIA) 56216; September 25, 1956
*78 Petitioner operated a trucking business in 1949 and 1950 and with others formed a corporation which operated this business during part of 1950. He was also licensed as a dealer in used cars and was a member of a partnership engaged in gambling activities. His records were incomplete and no books were available for 1949. No returns were filed by petitioner or the corporation for 1949 or 1950. He contended that losses were sustained and no liability for taxes existed. Respondent determined income from records of customers and from bank records which revealed large amounts of unidentified deposits, and determined additions to tax for failure to file returns, fraud, failure to file declarations of estimated tax and for substantial underestimates. Held: 1. Income is recomputed in accordance with proof. 2. Unidentified deposits, in the absence of proof to the contrary, represent taxable income. 3. Additions to tax for failure to file returns or estimates and for substantial underestimates are sustained. 4. Deficiencies were not due to fraud with intent to evade tax. Custer W. Sandlin, Esq., Republic Building, Oklahoma City, Okla., and George F. Saunders, Esq., for the petitioners. John *79 P. Higgins, Esq., for the respondent. TIETJENS
Memorandum Findings of Fact and Opinion The petitioner is Wilbur Howard McCormack, sometimes herein referred to as Howard McCormack. The respondent determined deficiencies against the petitioner individually for 1949 and 1950 and also as transferee of the assets of Howard McCormack, Inc., for 1950, together with additions to tax, as follows: Howard McCormack
as transferee of
Wilbur Howard McCor-
assets of Howard
mack individually
McCormack, Inc.
1949
1950
1950
Income Tax
$175,068.52
$23,695.25
$17,059.90
Excess Profits Tax
1,682.15
Addition to tax pursuant to: Sec. 291(a)
43,767.13
5,923.81
4,685.51
Sec. 293(b)
87,534.26
11,847.62
9,371.03
Sec. 294(d)(1)(A)
17,506.84
2,369.52
Sec. 294(d)(2)
10,504.11
1,421.72
The issues are whether the respondent erred in determining the gross income and allowable deductions for business expenses and depreciation of the petitioner in 1949 and 1950 and of a corporation organized by the petitioner and others in 1950; whether funds transferred to the petitioner by the corporation were dividends or repayments of loans; whether petitioner is entitled to deductions for certain uncollectible debts; whether respondent erred in computing *80 the tax upon the basis of an individual return instead of a joint return when no return was filed; whether petitioner is liable as a transferee of assets for taxes of the corporation; and whether the additions to tax for fraud, failure to file returns, failure to file estimates and for substantial underestimates of tax are warranted. Findings of Fact Wilbur Howard McCormack, the petitioner, was a resident of Oklahoma City, Oklahoma, in the taxable years 1949 and 1950. Maudie Lee McCormack was his wife. They had two minor dependent children. During 1949 and 1950 McCormack was engaged in the trucking business hauling produce into and out of Oklahoma City to and from other points, some as far away as California. He also engaged in gambling activities and was a licensed dealer in used cars. McCormack and his wife filed a joint Federal income tax return for 1948 reporting no income from salaries or wages and total taxable income of $22,372.97 with a tax of $4,299.10. Occupation was stated as "Gambling and Liquor." A schedule attached to the return reads: LIST OF GAMBLING PARTNERSHIPS
Big House Club, Roy L. Brown, Opr.
$12,612.12
Big House Club, Roy L. Brown, Opr.
3,130.35
Kentucky Club, Roy L. Brown, Opr. Loss
(1,066.67)
Kentucky Club, Roy L. Brown, Opr.
2,550.95
Hi-Lite Club, Roy L. Brown, Opr.
2,053.00
Total
$19,279.75
Jungle Club, E. C. Johnston, Opr.
$ 904.07
Big House Casino, E. C. Johnston, Opr. Loss
(5,313.75)
Big House Casino, E. C. Johnston, Opr.
7,303.10
Big House Casino, E. C. Johnston, Opr.
5,691.50
8,584.92
Hi-Lite Club, Ray Wilson, Opr.
3,215.70
Total Gambling Gains
$31,080.37
Personal Gambling Losses
31,080.37
Frey, Garretson & McCormack, Ptnrs., Liquor
$12,602.97
Hauling Liquor for B. S. Marsh
4,270.00
Recovery of Loss on Truck and Liquor re-
ported in 1947 1040 Tax Return: Loss reported
$8,500.00
Attorney Fees
$2,000.00
Traveling and Misc. Expenses
1,000.00
Total Expenses
3,000.00
Net Recovery
5,500.00
Total Taxable Income
$22,372.97
*81 The petitioner operated his trucking business under the name McCormack and Johnston Produce Co. at the beginning of 1949. From March 1949 to January 1950 he operated as McCormack Produce Co. or as Howard McCormack Produce Co. In January 1950 some of his equipment was repossessed by the finance company holding mortgages on it and the petitioner ceased operations. He resumed operations about the middle of April. On April 27, 1950, Howard McCormack, Maudie Lee McCormack, Paul Lewis, O. L. McCormack and E. G. McCormack, formed Howard McCormack, Inc., a corporation under the laws of Oklahoma, herein referred to as the corporation, to engage in the transportation business on its own account and for hire, in interstate and intrastate commerce under proper permits. O. L. McCormack and E. G. McCormack are petitioner's brothers. Paul Lewis had been employed by McCormack as a despatcher. The business was operated by the corporation until November 1950. McCormack acquired the following equipment used in his trucking business or that of the corporation: Date
Equipment
Acquired
Cost
1948
Mack Tractor
6- 5
[1] $10,700.00 Trm. Trailer
7- 8
[2] 6,656.50 Brown Trailer
7-28
[1] 6,030.08 GMC Tractor
8- 5
[2] 10,541.21 Mack Tractor
9-20
[1] 8,650.00 GMC Tractor
12-10
[1] 9,375.00 1949
Cadillac
2- 6
[1] 3,500.00 Packard
4- 8
[1] 1,500.00 GMC Truck
5-10
[1] 1,600.00 GMC Tractor
5-16
[2] 10,075.00 Dorsey Trailer
6- 9
[1] 7,874.80 Dorsey Trailer
6- 9
[2] 7,874.80 Reynolds Trailer
6-16
[5] 4,228.00 GMC Tractor
6-24
[1] 9,770.00 Kingman Trailer
6-24
[1] 6,800.00 Mack Tractor
6-30
[3] 10,846.50 Mack Tractor
8-31
[3] 12,077.80 Mack Tractor
8-31
[3] 12,077.80 Dorsey Trailer
9-15
[2] 6,578.00 Dorsey Trailer
9-15
[2] 6,578.00 GMC Tractor
10-24
[2] 9,600.00 Dorsey Trailer
11-30
[2] 2,900.00 Freuhauf Trailer
12- 1
[5] 12,360.33 1950
Int. Truck
4-22
[4] 2,500.00 Ford Truck
5- 8
[4] 1,225.00 Chev. Truck
5-19
[4] 1,345.50 GMC Truck
5-24
[4] 1,650.00 Mack Truck
6-10
[5] 13,088.97 Mack Truck
6-10
[5] 13,088.97 Mack Truck, Trailer
6-15
[4] 11,904.72 Trm. Trailer
7-20
[5] 12,592.10 Trm. Trailer, Int. Truck
7-31
[5] 12,051.65 Freuhauf Trailer
9- 5
[5] 3,000.00 Trm. Trailer
9-16
[5] 5,995.97 *82 In addition to the purchased equipment, McCormack leased tractors and trailers for hauling. He paid the owners 80 per cent of the receipts, furnished loads in both directions and paid brokerage, insurance, telephone and travel expense out of his share. On his own trucks he also paid expenses of maintenance and wages of the drivers. He paid drivers of his own trucks at first 20 per cent, and later 25 per cent, of the gross revenue from hauling. In 1949 and early 1950 he leased a total of 15 to 25 trucks at different times, having usually 10 to 12 under lease. McCormack made a loan to a person in California for which he received a check in the amount of $520 dated February 21, 1949, drawn on Bank of America National Trust and Savings Association. The check was returned as uncollectible and duly protested. McCormack was unable to collect this loan. Richard George operated a business under the name of Olympic Truck Co. in California. Some of his trucks hauled merchandise for McCormack. During the period May 31, 1949 to December *83 9, 1949 McCormack serviced George's trucks when they were in Oklahoma and George serviced McCormack's trucks when they were in California. McCormack advanced funds to George or to his drivers from time to time and George repaid some of the advances. The advances and servicing supplied by McCormack amounted to $31,264.31, of which George, by checks or similar services, repaid $11,867.13. The balance due McCormack was $19,397.18 at the end of 1949. McCormack was unable to collect this from George. Of this $18,962 represented loans or advances and the balance was for fuel or supplies furnished. One of McCormack's trucks was destroyed by fire in 1949. The insurer paid $16,250 on this loss. The check was sent to Yellow Manufacturing Acceptance Corporation which held the purchase money mortgage on this equipment and which remitted $7,152.50 to McCormack in September 1949. As a result of a collision on October 5, 1949, which damaged one of McCormack's Mack trucks, McCormack received a check in December 1949 in the amount of $3,546.75 for the balance of the insurance settlement. McCormack had no knowledge of bookkeeping and prior to June 1949 kept no books concerning his trucking business. *84 He engaged a bookkeeper who set up books and recorded his transactions from June to November 1949. The bookkeeper then left. In 1950 another bookkeeper kept records of the corporation for a few months ending in June or July 1950 when she became ill and was unable to keep them up to date. The records for 1949 are not available and the records for 1950 are incomplete. McCormack and his wife maintained a joint checking account at the Stock Yards Bank, Oklahoma City, during 1949. McCormack maintained business accounts with the Stock Yards Bank under the name McCormack and Johnston Produce Company in January 1949, and under the name McCormack Produce Company from March 1949 until October 1949. In the Citizens State Bank, Oklahoma City, he maintained two accounts, a personal account from August 1949 to January 1950, and a business account under the name Howard McCormack Produce Co. from November 1, 1949 until January 1950. In his operations as a dealer in used cars McCormack bought and sold automobiles and trucks, some of which he used for a time in his hauling business. He sold a 1949 Chevrolet to D. L. Kelly, doing business as Kelly Car Co. and received payment of $1,950 on April 12, 1949. *85 The Chevrolet cost McCormack $1,500 in 1949. On January 25, 1949, McCormack borrowed $1,000 from the Stock Yards Bank, Oklahoma City, which amount he repaid on February 21, 1949. On January 28, 1949, he borrowed $15,000 from J. C. Lambert of San Antonio, Texas, on a note secured by a chattel mortgage on equipment. Prior to 1949, McCormack owned a home on Northwest 32nd Street in Oklahoma City. On May 3, 1949, he borrowed $10,000 from Mutual Savings and Loan Association of Oklahoma City giving a mortgage on this property. In July 1949 he paid $2,500 on the principal of this loan. On July 26, 1949, he borrowed an additional $7,500 from the same lender on a second mortgage. In November 1949 he paid $2,500 on the principal of each loan. On February 1, 1950, he refinanced these loans and borrowed a total of $22,500 from the same lender on a first mortgage. In 1950 he paid $2,553.58 on the principal of this loan. The balance was owing at the end of 1950. The Old Oak Club, at McCloud, Oklahoma, filed partnership returns of income for 1949 and 1950, stating the partnership business as gambling and reporting distributable profits. McCormack was reported as having a 15 per cent interest in the *86 profits. His share was shown as $1,991.49 for the last two months in 1949 and $7,136.63 in 1950. On examination by a revenue agent increases in the partnership income were proposed amounting to $750 for 1949 and $1,000 for 1950, which were accepted by the partnership. McCormack's income from this source was $2,103.99 in 1949 and $7,286.63 in 1950. His gambling losses in each year exceeded these gains. In 1949 and 1950 McCormack was exchanging checks with certain other persons in an informal manner as a means of securing short-term bank credit of from three to six days from their respective banks. McCormack exchanged checks with Jack White, who was doing business as City Produce Co. Some checks given to White were drawn by McCormack on his own accounts and others were unidentified. McCormack also made cash loans to White. In 1949 the advances to White included $15,500 in cash, checks on McCormack's accounts amounting to $39,905.66, unidentified checks amounting to $15,118.29, and customers' checks amounting to $12,552.75, a total of $83,076.70. In 1950 the advances to White included unidentified checks of about $25,000, customers' checks of about $16,000, checks by McCormack of $950, *87 checks of the corporation for over $19,000, and some $4,000 of unidentified cash, a total of about $64,000. Notations were made on some of McCormack's checks given to White to indicate that the checks were in payment of purchases. These notations were false. He received loans from other persons or exchanged checks with others in the aggregate amount of $5,000 in 1949. In 1949 McCormack received from 25 customers for trucking services payments amounting to $122,619.77. Of this amount $87,315.31 was deposited in his various bank accounts and $35,304.46 was not deposited. He made additional deposits in his bank accounts of unidentified checks amounting to $85,720.58, unidentified currency amounting to $19,935.74, and checks from Richard George or Olympic Truck Co. amounting to $5,881.57. He also deposited $200 received from Donna A. Ellis; $118.33 from Paul Witt; $520.86 from a truck driver, Nelson; $500 from a truck driver, Seaton; and $50 from S. P. Carpenter. He also deposited checks on his own accounts amounting to $178.15 which were drawn to pay drivers and cashed from currency on hand. McCormack had the following income, deductible expenses, and adjusted gross income in 1949: INCOME: Identified hauling receipts
$122,619.77
Unidentified checks deposited
85,720.58
Unidentified checks loaned White
15,118.29
Gambling partnership income
2,103.99
Witt check
1,284.50
Ellis check
200.00
Kelly Car Co.
$1,950
less cost of auto
1,500
450.00
$227,497.13
EXPENSES: Checks on Citizens Bank
$ 65,656.79
Checks on Stock Yards Bank
5,707.17
Cash paid for expenses
9,171.90
Travel expenses
2,000.00
Gambling losses
2,103.99
Depreciation on equipment
15,000.00
Bad debts - R. George
18,962.00
Bad debts - other
520.00
Other loans or exchanges
5,000.00
Other expenses
7,000.00
$131,121.85
Adjusted gross income
$ 96,375.28
McCormack *88 did not file an income tax return for 1949. In January 1950 McCormack was delinquent in his installment payments on the General Motors equipment and the finance company, Y.M.A.C., repossessed the tractors and trailers and his bank accounts were seized by creditors. McCormack resumed the trucking business in April 1950 and the corporation was organized in that month. A bank account under the name of McCormack Produce Co. was opened on May 3, 1950 and used until May 24 when it was closed. An account with this bank was opened in the name of the corporation on May 16, 1950. This was actively used until October 24, and was closed on November 7, 1950. McCormack signed checks on the corporation's account. In 1950 prior to May 15, McCormack received from 17 customers for trucking services payments amounting to $30,317.06 of which $9,836.27 was deposited in his bank accounts and $20,480.79 was not deposited. Unidentified checks were deposited in his accounts in the amount of $2,000.80. J. W. Osborne contributed money in 1950 for operating the corporation's business and was a co-owner with the right to have a 50 per cent share in its profits. Some of this money was used in making down payments *89 on Mack trucks. Osborne advanced money as needed. His contributions in 1950 amounted to $31,850.86. The corporation applied to the Interstate Commerce Commission for a permit to operate in interestate commerce. The corporation's stockholders held no formal meetings and no stock certificates were issued. A. R. Griffith was a neighbor of McCormack who owned some trucks and did some hauling for McCormack under contract or lease. In August of 1950 J. W. Osborne and A. R. Griffith entered into an agreement in writing which recited that Osborne was owner of 50 per cent of the stock of Howard McCormack, Inc. and an undivided 1/2 interest in its rights and properties, that Griffith desired to purchase this stock and interest and that Osborne conveyed it for the price of $10,000, to be paid $2,500 in cash and the balance secured by a note for $7,500. A few days after making this arrangement the parties canceled it. McCormack had knowledge of this proposed transfer. In 1950 the corporation received from 42 customers for trucking services payments amounting to $150,268.62, of which $124,840.42 was deposited in the corporation's bank account and $25,428.20 was not deposited. Also $2,512.59 in *90 cash was withdrawn at the time of making deposits. Deposits also included $3,938.96 in unidentified checks, currency in the amount of $3,512.40; $3,677.17 in company checks; $25,432.24 in checks of Jack White in exchange for loans from McCormack, and $825.66 in other non-income items. McCormack made withdrawals of $11,479.43 in his own name or for his own benefit. The corporation received commissions from Richardson Brothers amounting to $761.35. Records described as "trip sheets" were retained of trips made by trucks operated by McCormack or the corporation in 1950. Trip sheets were available covering about 100 trips and the earnings of some 30 additional trips were reconstructed by the petitioner from other records. These trips began with April 13, 1950 and ended in September 1950. Trip sheets showed the origin and destination of the shipment, the consignee, gross charge for transportation, various expenses and net proceeds. The totals computed from the trip sheets and reconstructed trips were: Gross charges
$135,244.08
Road expenses
7,538.18
Truck rental
70,556.58
Total expense
79,264.63
Advances to drivers
27,241.17
Transportation tax
3,423.77
Net proceeds
49,531.41
In November 1950 the Interstate *91 Commerce Commission denied the corporation's application for a permit to operate and directed McCormack to cease operating. As a consequence McCormack and the corporation ceased hauling operations in November 1950. When McCormack ceased operations Griffith bought one of the Mack trucks making the further payments due upon it. One or two of the other trucks were taken over by E. G. McCormack who continued to make the payments due. Other trucks were sold to Lewis Stanley, Darrel Henthorn, and D. O. Rucker. The corporation had the following income and deductible expenses and net income in 1950: Identified hauling income
$150,268.62
Commission - Richardson Brothers
761.35
Unidentified checks deposited
3,938.96
Gross income
$154,968.93
Business expenses (including sala-
ries)
$113,442.91
Depreciation
3,608.84
Travel expenses
1,000.00
Deductible expenses
$118,051.75
NET INCOME
$ 36,917.18
McCormack had the following income, deductible expenses, and adjusted gross income in 1950, including salary and dividends or other income from the corporation: INCOME: Salary from corporation
$ 5,000.00
Dividends from corporation
22,688.89
Identified hauling income
30,317.06
Unidentified checks
2,000.80
Income from gambling partnership
7,286.63
Gross income
$67,293.38
EXPENSES: Loss on repossession of equipment,
January 1950
$10,000.00
Business expenses (Jan. 1 to May
15)
19,321.19
Depreciation (Jan. 1 to May 15)
2,721.44
Gambling losses
7,286.63
Deductible expenses
$39,329.26
ADJUSTED GROSS INCOME
$27,964.12
*92 On December 8, 1950, McCormack filed a petition in bankruptcy in the United States District Court for the Western District of Oklahoma and was on that day adjudged a bankrupt. In the Statement of Affairs sworn to on January 10, 1951, he represented that his occupation was trucker, that he made $27,000 in 1948 from his business and no money in 1949 or 1950, had no income from other sources, had filed federal and state income tax returns for 1948 and 1949, had kept books to a certain extent which were in his possession, had not destroyed any books or records relating to his affairs within the last two years, that he had not repaid any loans in the past year and that he had lost about $2,500 in gambling in the year preceding his petition. He stated that he was plaintiff in a pending action valued at $2,385 against American Airlines claiming damages for personal injuries, and that he was defendant in suits brought by Diesel Power Co. for $350; Firestone Tire Co. for $1,215.78; Jack D. Parker, reduced to judgment for $4,585 and costs of $500; H. E. Reed for $55,000; General Truck Co., for $4,000; Mack International Truck Co. for $9,000; and Getchell Truck Sales Company for $186.99. He also *93 stated that he owed $20,000 on a mortgage on his homestead, and estimated the value of his interest in the homestead at $10,000. He listed personal property consisting of household goods and furniture valued at $2,500 as belonging to his wife, wearing apparel valued at $100, and a Diesel motor in possession of Diesel Power Co. valued at $1,000. McCormack was discharged by the Court in Bankruptcy on February 13, 1951. In March 1951 McCormack and his wife filed an application for an extension of time until May 15, 1951, for filing a Federal income tax return for 1950, explaining that "more time is needed for preparing necessary records." McCormack did not file a return for 1950. The corporation did not file any income tax return. McCormack was charged in the United States District Court in 1953 with willful failure to make and file transportation tax returns for himself in May 1950 and for the corporation in the months of May to September 1950. He pleaded nolo contendere to five counts and was convicted and fined on those counts. McCormack was arrested on several occasions for gambling and paid fines or sometimes forfeited collateral without contesting the charge. He was also charged *94 with issuing bogus checks. McCormack had taxable income in 1949 and 1950. His failure to file income tax returns for those years was without reasonable cause. He filed no declaration of estimated tax for either year. The corporation had taxable income in 1950. Its failure to file corporation income and excess profits tax returns was without reasonable cause. McCormack was a transferee of assets of the corporation which was insolvent as a consequence of such transfers. None of the deficiencies in the case of McCormack or the corporation was due to fraud with intent to evade tax. Opinion TIETJENS, Judge: We are confronted with the problem of ascertaining, as nearly as may be from the proof, the true taxable income of the petitioner in 1949 and 1950 and of the corporation in 1950. The difficulties here presented are largely due to the absence of records adequate to show the correct income and expenses and to verify the cost and ownership of equipment used in the business. McCormack had no knowledge of bookkeeping. Records of his business were kept for a few months in 1949 but these are not available. Records are available for a part of 1950 but these are incomplete. No tax returns were *95 filed. The respondent made an extensive investigation and resorted to bank records of deposits and checks and to records of customers who paid for hauling services. From these sources amounts of gross income from hauling were ascertained and deductible expenses computed. In addition, the bank records revealed deposits of many thousands of dollars in unidentified checks and cash. The respondent determined that the petitioner and his corporation realized over $300,000 in the taxable years. This determination was based upon admitted income from hauling, additional unexplained deposits, and known income from a gambling partnership. Allowance was made for proved expenses and no addition was made for living expenses. As the respondent points out, unidentified deposits to a checking account, in the absence of explanation or proof to the contrary, normally constitute income. Goe v. Commissioner, 198 Fed. (2d) 851 (C.A. 3, 1952), affirming a Tax Court Memorandum Opinion [10 TCM 307,]. The respondent says that McCormack and the corporation had at least the following gross receipts and are entitled to deductions for no more than the following amounts of operating expenses and depreciation: *96 Corpo-
Petitioner
ration
1949
1950
1950
Gross receipts
$272,545.18
$67,293.35
$162,158.50
Operating ex-
penses and
depreciation
49,755.75
16,138.33
111,124.73 The respondent says further that McCormack received $27,688.89 in salary and dividends from the corporation in 1950, that the corporation is entitled to a deduction for $5,000 for salary of McCormack, but is not entitled to deductions for his travel expenses nor for losses on the sale of its equipment in 1950 in the absence of proof thereof. It is the respondent's position that McCormack is liable for the several additions to the tax determined and that he is liable as a transferee for the taxes determined against the corporation. McCormack contends that his operating expenses, travelling expenses, bad debt losses, and depreciation exceeded his gross receipts from his trucking business, that the unidentified checks and cash deposited in his bank accounts were not income items, but were loans, check exchanges or checks written on his account and later deposited in the same account and that the funds he received from the corporation in 1950 were not dividends, but were repayments of money he had advanced to the corporation or had borrowed from *97 Osborne on his own credit and used to pay expenses of the corporation. He contends further that he sustained an ordinary business loss of at lease $25,000 in January 1950 upon the repossession by the finance company of the General Motors trucks and trailers he was then using. He points out that at the beginning of 1949 he owned his home and some trucking equipment, but at the end of 1950 he was bankrupt and owed $20,000 on a mortgage on his home. McCormack argues, also, that if he had taxable income in either year, it should be computed upon the basis of a joint return and that the allowable deduction for depreciation on his equipment should be greater than the amounts allowed by the respondent. He denies that the unidentified checks represent gains from gambling, saying that when he was winning he would usually not accept a check and if in rare cases he did so he would go to the maker the next day and have him cash it. He alleges that his gambling losses in 1949 and 1950 exceeded his gambling gains and contends that therefore the known gains should not be included in income. McCormack says that the unidentified checks represent check exchanges with other persons who accommodated him *98 from time to time, naming Jack White, A. R. Griffith, Paul Witt, and John Beard. White corroborated the testimony as to check exchanges of about $80,000 in 1949 and $60,000 in 1950 and these checks were traced in White's bank account. Griffith testified that he had loaned McCormack amounts of $500 to $1,500 from time to time which were repaid in cash, but he did not testify to exchanging checks with McCormack. E. G. McCormack testified to several loans or check exchanges with his brother. Neither Witt nor Beard testified and there is no evidence to corroborate McCormack's assertion of extensive exchanging of checks except with White. There were unidentified checks amounting to some $85,000 deposited in the banks and $15,000 exchanged with White in 1949 and additional amounts in 1950 which are not shown to have come from non-income sources. The greater part of the unidentified income consists of these checks. There were also large deposits of cash from unidentified sources. McCormack indulged in gambling in considerable amounts. He was a member of partnerships operating gambling clubs and shared in their profits. His 1948 return reported gambling profits of over $30,000 and claimed *99 deduction for an equal amount of gambling losses. He had income from gambling partnerships in 1949 and 1950. He testified to a loss of $12,000 on one occasion at Las Vegas in 1950, and said that at the end of that year he owed $35,000 or more at Las Vegas. He admitted that he had been arrested on several occasions for gambling and had paid fines or sometimes forfeited collateral without contesting the charges. He also pleaded nolo contendere to charges of failure to make and file transportation tax returns for certain periods in 1950. He filed a petition in bankruptcy in December 1950 at a time when various creditors had pending lawsuits or held judgments against him. In the documents filed in that proceeding he made several statements inconsistent with his testimony or contentions in this case, as he represented that he had filed a federal income tax return for 1949, had lost about $2,500 in gambling in the preceding year, had not been in partnership with anyone in the six years preceding and that he had no income from sources other than the trucking business in the two preceding years. He did not list a debt to Osborne among his liabilities but now he says he owed Osborne over $30,000 *100 at the end of 1950. In the present case he admitted that he had also been charged with issuing bad checks. He testified further that notations made on some of the checks issued to White were false and were intended to mislead the banks. McCormack's explanation of the unidentified checks is not convincing and it is uncorroborated except for the exchanges with White which have been identified. We are not persuaded that this explanation can be relied upon. These checks may represent income derived from gambling, from undisclosed hauling income, or from liquor sales or filling station profits (which he described as being among the sources of his income in 1948) or from some other source not revealed. It is not necessary that the respondent prove the source of the unidentified income. A failure to show the source proves nothing more than that it was well hidden. Thomas v. Commissioner, 223 Fed. (2d) 83, 86 (C.A. 6, 1955). The burden is upon the petitioner to show that these receipts were not taxable income, and this he has not done. Except for the specific loss of $12,000 in 1950, McCormack's testimony concerning gambling losses is not supported. However, the manifest loss in net worth *101 which McCormack experienced in these two years leads to the conclusion that whatever income he had was exceeded by gambling losses. Consequently we have allowed deduction for gambling losses in amounts equal to the proved gambling gains. Furthermore, we do find from the evidence that some other items included in income should be treated as non-income receipts and that a larger allowance should be made for deductible business expenses. The parties agree that in 1949 McCormack had gross income from hauling operations amounting to $122,619.77, of which $87,315.31 was deposited in his bank accounts and $35,304.46 was not. His bank accounts show further deposits of unidentified checks in the amount of $85,720.58 and cash in the amount of $19,935.74. He had income, also, from a gambling partnership in which his distributable share was $2,103.99. The respondent determined that these items were includible in the income for 1949. The respondent also included in income for 1949 amounts advanced to Jack White consisting of cash $15,500, unidentified checks $15,118.29, and checks of Carpenter $863.40 and Witt $1,284.50 payable to McCormack. Also included in income were checks from Richard George *102 amounting to $5,881.57, individual checks from Kelly Car Co. $1,950, Ellis $200, Witt $118.33, Carpenter $50, Nelson $520.86, and Seaton $500, and checks drawn on McCormack's accounts, cashed by him and redeposited amounting to $178.15. The total amount of gross income thus computed is $272,545.18. McCormack argues that the unidentified cash was not additional income, that it may have been derived from some of the hauling income receipts which were not deposited in the bank accounts. He points out that $35,304.46 of the known income from hauling in 1949 was not so deposited and this could account for most of the $19,935.74 in unidentified cash deposited and $15,500 of cash loaned to White and the item of $178.15 for company checks drawn, cashed and then redeposited. We accept McCormack's explanation as to this and eliminate these items from gross income even though their sum is slightly in excess of the hauling income not deposited. The $1,950 received from Kelly Car Co. represents the proceeds of the sale of a Chevrolet and is properly includible in income, minus the amount paid upon acquiring the car. This cost is not shown, but since it was a current model we allow, in the absence *103 of better evidence, an offset of $1,500 as representing its cost. The Carpenter check for $50 and Witt check for $118.33 were already included in the gross receipts from trucking and should not be included again in gross income. It appears likely that the Carpenter check for $863.40 was also included in gross receipts from trucking, since a deposit of $1,500.80 from Carpenter was recorded. Nelson was an employee and the item of $520.86 representing a check from him and the $500 check from Seaton, a truck driver, are not includible in income as McCormack cashed checks for truck drivers as an accommodation to them. Checks from Richard George or Olympic Truck Co. amounting to $5,881.57 were deposited. McCormack loaned funds to George in 1949, advanced money to the latter's drivers and provided fuel and other services which he charged to George on an open account. In turn George serviced McCormack's trucks when in California and made remittances from time to time. McCormack's advances and charges for servicing amounted to $31,264.31. George repaid by checks or similar services $11,867.13, including the deposited checks. At the end of 1949 George owed McCormack the balance of $19,397.18 *104 which proved to be uncollectible and for which McCormack claims a deduction as a bad debt. The respondent included the $5,881.57 in McCormack's income and denies that the uncollected balance is deductible as a bad debt, saying that the advances to George have been included in the expenses for which deductions are allowable, hence allowance of a deduction for the bad debt would be allowing a double deduction for the same items and that failure to collect the account merely deprives the taxpayer of income. This is true as to fuel furnished the trucks from McCormack's supply and charged to the account, amounting to about $435. But comparison of the other items in the account with the expenses for which deductions are claimed shows that the items charged to George were not included in these expenses. Therefore the checks from George deposited should not be treated as income since they were in repayment of loans, and the balance owing by George at the end of the year and which proved uncollectible is deductible as a bad debt. This does not amount to a double deduction. The amount allowable after eliminating the charges for fuel furnished is $18,962. The other items in the respondent's computation *105 are not shown to have been other than income. The computation of gross income for 1949 as adjusted by the elimination of some of the foregoing items is shown below. 1949
Respondent's
Held
Explanation of
Income
Determination
Includible
difference
Identified hauling income
$122,619.77
$122,619.77
Unidentified checks deposited
85,720.58
85,720.58
Unidentified checks loaned to White
15,118.29
15,118.29
Gambling partnership income
2,103.99
2,103.99
Witt check
1,284.50
1,284.50
Ellis check
200.00
200.00
Kelly Car Co. check
1,950.00
450.00
Cost found to be $1,500
Unidentified cash deposited
19,935.74
Considered derived from
Cash loaned to White
15,500.00
hauling income not
Company checks
178.15
deposited
Carpenter check
863.40
Included in hauling
Carpenter check
50.00
checks deposited
Witt check
118.33
Richard George checks
5,881.57
Repayments of loans
Nelson check
520.86
Checks cashed for
Seation check
500.00
employees
$272,545.18
$227,497.13 The respondent allowed $41,899.23 as business expenses and $7,856.52 for depreciation on equipment in 1949. McCormack alleges that his expenses of operation were at least $130,000. There is not sufficient proof to support this allegation. Analysis of his bank accounts, paid bills and cash payments supports *106 the computation of expenses shown in our findings of fact. Cash payments shown by paid bills are agreed to have amounted to $9,171.90. Expenses paid out of two accounts at the Citizens State Bank amounted to $65,656.79. The respondent contends that of this amount $249.92 represented overload fines which are not allowable deductions as contrary to public policy. While the respondent has so ruled subsequent to the years before us, that ruling was expressly made inapplicable to such fines incurred or paid prior to December 1, 1950. The position of the respondent in 1949 and 1950 was that such fines were similar to road tolls and were deductible. I.T. 4042, Internal Revenue Cumulative Bulletin 1951-1, 15. These payments were deductible. From the Stock Yards Bank accounts expenditures of $17,398.27 were traced, but of this amount $11,691.10 was paid for capital items such as equipment or on the principal of notes, leaving $5,707.17 as deductible expenses. In addition there was a bad debt deduction of $520 which is allowable as well as the uncollectible debt of George amounting to $18,962. The respondent allowed depreciation on equipment as follows: McCormack
Corporation
1949
1950
1950
Equipment, Tractors
7
4
5
Equipment, Trailers
2
2
3
Cost
$87,797.64
$62,297.64
$88,857.23
Salvage at 20%
17,559.52
12,459.53
17,771.43
Basis for depreciation
70,238.12
49,838.11
71,085.80
Estimated life
5 years
5 years
5 years
Depreciation allowable
$ 7,856.52
$ 2,721.44
$ 3,608.84
McCormack *107 argues that a larger allowance should be made for depreciation, that the respondent's computation did not include all the equipment owned and that the proper estimated life of the tractors was three years instead of five, since the tractors were in constant use and covered 100,000 to 150,000 miles annually. Schedules prepared for McCormack (Exhibits 15 and 16) list for 1949, 22 tractors, trailers or automobiles at a cost of $175,112.50 and claim depreciation of $23,133.34, and for 1950 list 24 pieces of equipment at a cost of $185,781.97 and claim depreciation of $8,081.31. The computation assumes a life of six years for trailers and three years for other equipment. The schedules were prepared after the beginning of the respondent's investigation. Respondent attacks the schedules because the source of some of the information is unknown or lost, the accountant who participated in preparing them is no longer living, and the ownership of all the equipment is not proved. However, the purchases of some of the vehicles are corroborated by records of the dealers who sold them and the preparation of the schedules is attested to by a witness who procured information and assisted in preparing *108 them. We think the schedules are sufficient to show the equipment. However, the petitioner's evidence is not adequate to justify using an estimated life of less than five years. We find that a fair allowance for depreciation on the equipment in use in 1949 is $15,000 instead of the figure determined by the respondent. In 1950 the equipment was not used for the entire year. The respondent's allowance for 1950 to McCormack and to the corporation aggregating $6,330.28 appears to be all that is reasonably allowable on the basis of the evidence of record. McCormack alleges that he expended $10,000 to $12,000 per year for travel in search of hauling contracts, making several trips to California and others to Texas, Wisconsin, Kansas, Missouri, and one or two to Washington, D.C. There is corroboration of numerous absences on trips, many telephone calls from other places and of one visit to Washington, D.C. in September 1949, apparently for business purposes. The respondent made no allowance for such travel expenses in the absence of records of these trips and the amounts expended. Undoubtedly some amounts were expended for these purposes. In the absence of proof of larger expenditures we *109 have found as facts that McCormack had deductible travel expenses amounting to $2,000 in 1949 and the corporation incurred deductible travel expenses of $1,000 in 1950. McCormack argues that since the expenses paid out of his business and personal bank accounts in the Citizens State Bank in the amount of $65,656.79 covered only the period August 22 to December 31, 1949, a duration of 132 days, and average $497 per day, the expenses for the earlier part of the year should be computed at the same average rate, and the total for the year would exceed $180,000, or if computed from March 23, when the Stock Yards Bank account was opened, would amount to more than $140,000. The evidence is not sufficient to support either computation. There is no showing that the business was operated on the same scale throughout the year. On the contrary, the evidence that some additional equipment was acquired in 1949 would indicate a growing business in which the expenses in the later months would be larger than those of the first part of the year. The record of expenses from paid bills and statements of the Stock Yards Bank shows comparatively small monthly amounts from March to July, inclusive, with *110 less than $5,000 in proved expenses for this period. The bank records do not show all the expenses paid. Undoubtedly there were other expenses paid which cannot now be proved. We allow, in the absence of better evidence, $7,000 as representing additional expenses paid in 1949. Since there is some evidence that E. G. McCormack and Griffith made loans or exchanged checks, we allow, also, $5,000 as a deduction representing unidentified checks which were loans or check exchanges with other persons than White. The computation of allowable expenses for 1949 is as follows: Allowed by
Items
Explanation of
Expenses
Respondent
Allowable
differences
Business Expenses
$41,899.23
Cash expenses
$ 9,171.90
Expenses shown by
Citizens Bank checks
65,656.79
analysis of bank ac-
Stock Yards Bank checks
5,707.17
counts and bills
Bad debt
none
$ 520.00
Check uncollectible
R. George bad debt
none
18,962.00
Loan uncollectible
Depreciation
$ 7,856.52
15,000.00
More equipment involved
Travel expense
none
2,000.00
Evidence shows some
expenses
Gambling losses
none
2,103.99
Losses apparently ex-
ceeded gains
Loans and check exchanges
none
5,000.00
Unidentified loans or
check exchanges
Additional expenses
none
7,000.00
Allowance for un-
proved expenses
$49,755.75
$131,121.85
In *111 1950 McCormack individually received $30,317.06 for hauling services, of which amount $9,836.27 was deposited in bank accounts and $20,480.79 was not. Unidentified checks amounting to $2,000.80 were also deposited. The respondent has allowed deductions for operating expenses of $13,416.89 and depreciation of $2,721.44, a total of $16,138.33. McCormack alleges that $525 of the unidentified checks represent two checks for $200 and $325 drawn on McCormack's account at the Oklahoma National Bank which were cashed and later deposited. These checks have not been identified from the bank records and we must sustain the respondent. McCormack alleges that he sustained a loss of at least $25,000 in January 1950 when the finance company repossessed his equipment. He says that he had an investment of about $50,000 in the trucks and trailers and owed approximately this sum when they were taken back. Some eight items having a total cost of over $60,000 appear to have been repossessed. The records do not show the amount invested or the amount remaining to be paid or the depreciated value of this equipment. However, some substantial payments had been made upon some of it. In the absence of better *112 evidence we find as a fact that McCormack incurred a loss of $10,000 on repossession of this equipment. McCormack also contends that he sustained a loss of $2,500 for improvements made in leased premises which were vacated when he ceased doing business in 1950. It is not shown whether the expenditures were made by McCormack or by the corporation and there is no proof whatever of the amount so expended. We are unable to find from the evidence that a loss was sustained in the amount claimed or in any lesser amount. No claim is made for loss on the termination of business in November 1950 and we have no satisfactory evidence of the amounts invested in the equipment or the amounts owing, or the prices, if any, paid by the persons taking over the property. We are unable to determine that any loss was then sustained. In Docket No. 51928 the respondent determined deficiencies against McCormack as transferee of the assets of the corporation for income and excess profits tax liability of the corporation for the taxable year April 27, 1950 to November 27, 1950, together with additions to tax for failure to file a return and for fraud. McCormack attacks the determination of the amount of tax *113 liability and denies liability as a transferee alleging that funds he received from the corporation were in repayment of advances he made to it. In his petition McCormack alleges error of the respondent in allocating income and expenses in 1950 between himself and the corporation which had no separate existence. This allegation is not argued on brief and we deem it abandoned. It is agreed that the corporation received $150,268.62 in hauling income, of which $25,428.20 was not deposited in the bank account. In addition, a commission of $761.35 from Richardson Brothers was received but was not deposited. Also, unidentified checks in the amount of $3,938.96 were deposited. These items, amounting in all to $154,968.93, were the income of the corporation. The respondent also included $3,677.17 in company checks and $3,512.40 in unidentified currency. The company checks represent checks drawn, cashed, and then deposited. Since McCormack had retained over $25,000 in hauling payments which were not deposited, we assume that this cash came from that source and eliminate these two items from gross income. The respondent allowed the corporation operating expenses of $107,515.89 and depreciation *114 of $3,608.84 for the seven months of its operation. McCormack shows that the corporation had operating expenses of $113,442.91. He claims $5,000 for his travel expenses on the corporation's business. This amount is not substantiated and we allow $1,000 in the absence of proof that a larger amount was so expended. No error is shown in the respondent's computation of allowable depreciation. Total deductible expenses and depreciation thus amount to $118,051.75 and adjusted gross income was $36,917.18. Among the expenses of the corporation allowed by the respondent as deductions was the amount of $5,000 as salary to McCormack for his services. The corporation was in operation for about seven months in 1950. There is no evidence presented as to the reasonable value of McCormack's services and the amount allowed as his salary is not shown to be inadequate. McCormack received from the corporation specific distributions in addition to this salary, amounting at least to $22,688.89. This may be computed as follows: McCormack retained checks amounting to $25,428.20 which were not deposited, he withheld $2,512.59 in cash for deposits, and withdrew $11,479.43 for personal use, a total of $39,420.22. *115 It is assumed that from this amount he made the cashdeposits aggregating $3,512.70, and may have paid out in cash for possible expenses of the corporation $8,218.93, leaving $27,688.89 in his possession including the salary of $5,000. Since the net earnings of the corporation exceeded $22,688.89, this amount of the distribution is to be treated as a dividend. McCormack argues that the funds he received from the corporation in 1950 were repayments of funds he advanced to the corporation or borrowed from Osborne and furnished to the corporation. Osborne had advanced money amounting to $31,850.86 for operations of the corporation and had a 50 per cent interest in the business. The agreement made between Osborne and Griffith in August 1950 indicates that Osborne then was a 50 per cent owner of the corporation, not a creditor. It is true the corporation was operated informally, no stock certificates were issued, no minutes of directors meetings were recorded and no formal action was taken to define the title or authority of officers or to negotiate loans. Apparently Osborne paid in money and was entitled to stock. McCormack did not list a debt to Osborne among his debts in his bankruptcy *116 proceeding, apparently because he regarded Osborne as a co-owner of the corporation rather than his personal creditor. But here he argues that he borrowed from Osborne to finance the corporation's business and his withdrawals were a return of capital. It has not been shown that he passed any of these withdrawals on to Osborne. The corporation had income, according to the respondent's determination which is not proved to be in error, McCormack received a distribution from the corporation, and there were sufficient earnings and profits to cover this distribution. Under the plain requirements of section 115(a) and (b), Internal Revenue Code of 1939, this must be treated as a dividend and as income to McCormack. The respondent determined that McCormack was liable as a transferee of assets of the corporation for the taxes and additions to tax owned by it. In the answer it is alleged that the corporation transferred its assets, without adequate consideration, to McCormack. This is denied in the reply which alleges further that funds received from the corporation were in repayment of advances and loans. The respondent has the burden of proving transferee liability. Section 1119, I.R.C. 1939. *117 It has been shown that McCormack received certain funds from the corporation. Also at the time of ceasing business, he arranged to transfer the remaining trucks or equipment to various persons who would take over the liabilities for the further payments. In these ways he disposed of the corporation's assets and left it insolvent and unable to pay the income taxes for which it is liable. This sufficiently proves that McCormack incurred liability as a transferee of assets of the corporation for its taxes, to the extent of the value of the funds withdrawn and the assets transferred to or through himself. Section 311, I.R.C. 1939. McCormack's income for 1950 included $5,000 in salary and $22,688.89 in dividends from the corporation, identified hauling income from his individual business amounting to $30,317.06, unidentified checks amounting to $2,000.80 and gambling partnership income of $7,286.63, a total of $67,293.38. This is the amount of gross income determined by the respondent. It appears from the record that in 1950 McCormack exchanged with White a large amount in unidentified checks which might also have been included in this determination. At least the respondent's determination *118 in this respect is not shown to be excessive. The allowable deductions for expenses for 1950 were business expenses prior to May 15 proved by McCormack, amounting to $19,321.19, loss on repossession by the finance company of equipment in January 1950, $10,000, and depreciation on equipment used prior to the corporation's operation of the business, $2,721.44, also gambling losses deductible to the extent of the gambling gains of $7,286.63. The adjusted gross income was $27,964.12. This computation is shown in our findings of fact. The respondent determined additions to tax pursuant to Sections 291, 293, and 294 of the Internal Revenue Code of 1939 for failure to file returns, failure to file declarations of estimated tax, substantial underestimations of tax, and for fraud. The addition for failure to file a return applies unless the petitioner shows that such failure was due to reasonable cause and not due to willful neglect. McCormack argues that he made no money in the taxable years and the corporation also operated at a loss, and that he was advised by a deputy collector of internal revenue that no penalty would be imposed for failure to file returns if a taxpayer had no net income. *119 He points to the statement in his bankruptcy proceeding that he made no money in the taxable years as supporting his conclusion that he was not required to file returns. It is noted that he and his wife requested an extension of time for filing a return for 1950 and then did not file. At least some basis for filing a return for 1950 was considered to be existing. We have sustained the respondent's determinations that McCormack in both these years and the corporation in 1950 had substantial net taxable income. McCormack has not proved that he and the corporation had no taxable income and hence has not proved that reasonable cause existed for the failure to file returns. A taxpayer's mistaken belief that no return is required is not reasonable cause for his failure to file. P. Dougherty Co. v. Commissioner, 159 Fed. (2d) 269 (C.A. 4, 1946). The additions to tax of 25 per cent under section 291 are sustained. Since no declarations of estimated tax were made the additions for failure to file declarations and for substantial underestimate of tax are applicable as to McCormack for both years. The respondent determined additions to tax for fraud with intent to evade tax with respect to *120 each deficiency. The burden of proof of fraud is upon the respondent, Section 1112, Internal Revenue Code of 1939, and affirmative proof of a clear and convincing nature is required. The respondent refers to the large amounts of unexplained bank deposits and the absence of adequate records of transactions, to arrests for gambling, conviction for failure to file transportation tax returns, and misstatements in the Statement of Affairs filed in the bankruptcy proceedings as evidence that McCormack was untrustworthy and guilty of fraud with intent to evade tax. This is far from sufficient to support the addition to tax for fraud. Although we hold that McCormack has not proved error in the respondent's determination that certain large amounts deposited in the bank accounts were income, this negative conclusion is not enough to sustain the additions to tax for fraud. * The failure of a taxpayer to overcome the presumptive correctness of deficiencies, standing alone, cannot be regarded as proof that the deficiencies were in some part due to fraud of the taxpayer. Drieborg v. Commissioner, 225 Fed. (2d) 216 (C.A. 6, 1955); L. Glenn Switzer, 20 T.C. 759 (1953), remanded per stipulation, *121 C.A. 9, 1954. The other evidence is also insufficient to prove fraud in this case. McCormack contends that any liability ultimately found to be due should be computed upon the basis of a joint return and not, as the respondent has determined, upon the basis of a separate return. Section 51(b) (1) of the Code provides that a husband and wife may make a single return jointly, in which case "the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several." McCormack and his wife did not file a joint return for 1949 or 1950. Since no joint return was filed and the income here involved was entirely that of McCormack, the respondent was without authority to determine a deficiency against Maudie Lee McCormack. She is not a party to this proceeding and the respondent may not make her liable for the taxes owed by the petitioner by arbitrarily determining the liability on a joint basis. We have no jurisdiction to subject her to *122 a liability for a tax when she has not elected to accept it by joining in filing a joint return. The petitioner argues that joint returns were made which are in the record as exhibits 9 and 10, and that, although these were not filed, the making and signing of these should be sufficient. However, this is not adequate, in the absence of filing with the collector of internal revenue, to make the petitioner's wife liable for deficiencies determined as to thse years or to authorize the respondent to compute the taxes on the basis of joint returns. Decisions will be entered under Rule 50. Footnotes
1. Sold or wrecked in 1949. ↩
2. Repossessed by YMAC, 1-17-50. ↩
5. Disposed of 9-16-50 to 11-1-50.↩
3. Sold, January or February 1950. ↩
4. Sold or transferred May-August 1950. ↩
*. This sentence was amended by an official order of the Tax Court, dated October 29, 1956, and signed by Judge Tietjens↩. The sentence formerly read in part: "amounts deposited in the bank accounts were not income".